**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


HCC Specialty Underwriters, Inc.

    v.                              Civil No. 16-cv-501-LM
                                       Opinion No. 2018 DNH 020
John Woodbury, et al.


# O R D E R

Plaintiff HCC Specialty Underwriters, Inc. ("HCC") brings suit against defendant John Woodbury, a former employee of HCC, and defendant Buttine Underwriters Agency, LLC d/b/a Prize and Promotion Insurance Services ("PPI"). PPI is both Woodbury's current employer and a competitor of HCC. HCC's claims arise out of Woodbury's alleged breaches of noncompete and nondisclosure agreements. HCC seeks a preliminary injunction requiring both defendants to abide by the terms of Woodbury's noncompete and nondisclosure restrictions. Defendants object. The court held a two-day evidentiary hearing on HCC's motion. For the following reasons, HCC's motion is granted in part and denied in part.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Bruns v. Mayhew, 750 F.3d 61, 65 (1st Cir. 2014) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).  The first factor, likelihood of success, is "[t]he sine qua non of [the] four-part inquiry," New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002), and the second factor, irreparable harm, also "constitutes a necessary threshold showing for an award of preliminary injunctive relief," González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009).  The third factor focuses upon the "hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does." Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003).  The final factor concerns "the effect, if any, that an injunction (or the withholding of one) may have on the public interest."[1] Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).

---

[1] The First Circuit has questioned whether a court should weigh the "public interest" factor in a diversity case applying Massachusetts law, given that, under such law, a court need not consider the effect of an injunction on the public interest. See Harnett, 731 F.3d at 9 n.1.  As neither party has raised the issue here, this court, like the Harnett court, does not address the question.  See id.

The movant bears the burden of establishing entitlement to preliminary injunctive relief.  See Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

**BACKGROUND**

Before delving into the evidence presented at the hearing, some context will be helpful.  The court therefore briefly discusses the industry in which the parties operate, and HCC's general allegations against defendants.

I.  Specialty Insurance Industry

Both HCC and PPI are providers of specialized insurance products.  Relevant here are three types of insurance: prize indemnity, contractual bonus, and over-redemption.  Prize indemnity insurance provides insurance for promotions where prizes are distributed upon the occurrence of a specified contingency.  Examples include a half-court shot promotion at a basketball game and a "spin-the-wheel" promotion at a retailer. Contractual bonus insurance exists for contracts under which an athlete or coach receives an incentive payment if he or she meets a certain goal.  Thus, if a professional basketball player is contractually entitled to receive a bonus payment for winning a league championship, contractual bonus insurance covers that risk.  Over-redemption insurance protects against the risk that

too many consumers will redeem a coupon or discount issued by a business.

There are a number of different actors within the industry. Insurance companies, like HCC and PPI, analyze risks and underwrite policies. The insured can be the entity seeking to cover a particular risk, like a store running a prize promotion for customers. In the case of prize indemnity insurance, the insured can also be a third-party promotional agency, which runs the promotion on behalf of a business. There are also insurance brokers, who act as intermediaries between entities seeking insurance and the insurance companies providing such insurance. Finally, there are reinsurers, who agree to cover some of the risk underwritten by an insurance company in exchange for a portion of the premium paid by the insured. The arrangement between an insurance company and a reinsurer may be negotiated as to each individual policy, or the parties may have a standing agreement that allows the insurance company to bind the reinsurer to a certain number of policies without requiring additional approval.

Policies issued by insurance companies in this industry are generally nonrenewable. That is, unlike other forms of insurance, clients come to insurance companies to cover specific risks, and the policies do not automatically renew once the policy term has elapsed. When combined with the fact that

promotions tend to occur on an irregular basis, the result is
that the business of these insurance companies is not
consistent, but cyclical.  Still, the record shows that brokers,
promotional agencies, and businesses tend to develop
relationships with certain insurance companies, such that
insurance companies have an expectation that a portion of their
client base will return when a particular risk or promotion
needs to be covered.

II.  <u>HCC's Allegations against Defendants</u>

Woodbury worked for HCC, or one of its predecessors,[2] from
1992 to June 2016.  HCC alleges that, in that time, Woodbury
signed two agreements that restrict his ability to work for PPI.
In 1996, Woodbury executed the first agreement with HCC (the
"1996 Agreement").  The 1996 Agreement imposes two kinds of
restrictions on Woodbury.

---

[2] The parties dispute the corporate history of HCC.
Defendants argue that HCC is not the same entity as those
entities with whom Woodbury executed his employment agreements.
This is material, in defendants' view, because they assert that
Massachusetts law does not allow an assignee (<u>i.e.</u>, HCC) to
enforce a restrictive covenant.  Based on the evidence, the
court finds that HCC is likely to show that it is the same
entity as American Specialty Underwriters, Inc. (Woodbury's
employer when he signed the 1996 Agreement), and ASU
International, Inc. (Woodbury's employer when he signed the 2001
Release).  Therefore, for ease of reference, and unless context
dictates otherwise, the court will refer to HCC and its
predecessors simply as HCC.

The first relates to competition (the "noncompete restrictions" or "noncompete obligations"). Woodbury agreed that, during his employment and for a period of two years following his termination, he would not engage in certain types of competitive activities:

[T]he Employee shall not . . .

(i) divert or attempt to divert business from the Employer including but not limited to soliciting, attempting to solicit or accepting business from any policy holder, or person or entity underwritten by the employer or any of the employer's clients; . . .

(iii) interfere in any material respect with any business relationship between the Employer and any other person; or

(iv) render any services as an officer, director, [or] employee . . . to . . . any person who is engaged in activities which, if performed by the Employee, would violate [these provisions].

Doc. no. 82-1 at 4 of 5. The Agreement goes on to state that "[t]he foregoing restrictions are not intended to restrict the Employee in securing employment in any other insurance-related business endeavor." Id.

The second restriction relates to nondisclosure and confidentiality (the "nondisclosure restrictions" or "nondisclosure obligations"). Woodbury agreed that he would not "at any time during or after the date of this Agreement" disclose or use HCC's confidential information without authorization. Id. at 3 of 5. Confidential information is

6

defined to include "business strategies; customer lists; the particular demands and requirements of customers and insureds generally; client insurance, financial and commercial data including underwriting information and guidelines, policy language and premium data; and the business and financial records of the Employer."  Id.

Woodbury agreed that, with respect to either set of restrictions, "remedies at law for any breach" would be inadequate and that "temporary or permanent injunctive relief may be granted . . . without the necessity of proof of actual damages."  Id. at 4 of 5.  The Agreement recites as consideration that Woodbury could receive discretionary bonuses during his employment, and would be entitled to receive a mandatory severance payment upon termination of his employment. The severance payment would increase depending on the length of Woodbury's employment, up to a cap of $20,000.  The 1996 Agreement is governed by Massachusetts law.

HCC alleges that Woodbury later reaffirmed these restrictions in a second agreement.  Specifically, in October 2001, the parent company of HCC (HCC Insurance Holdings, Inc.) entered into a security purchase agreement with a predecessor of HCC (ASU International), whereby HCC's parent company acquired the stock of HCC's predecessor.  Woodbury executed a release as part of the acquisition (the "2001 Release").  Under the 2001

Release, Woodbury confirmed his obligations under "any applicable nondisclosure [or] non-competition" agreements, and further agreed that the provisions of such agreements would be "specifically incorporated" into the Release. Doc. no. 46-1 at 5 of 6. The consideration recited in the 2001 Release is the payments Woodbury would receive in connection with the acquisition, which ultimately exceeded $132,000.[3] The 2001 Release is governed by Delaware law.

The present litigation arises from Woodbury's decision to leave HCC in June 2016. Immediately after leaving HCC, Woodbury joined Buttine Underwriters Agency ("Buttine"), which created PPI—a new division within the company—to provide insurance in the three categories of insurance that Woodbury specialized in while at HCC: prize indemnity, contractual bonus, and over-redemption. HCC contends that since joining PPI, Woodbury has repeatedly violated both the noncompete and nondisclosure covenants in his agreements. Regarding competition, HCC alleges that Woodbury has solicited businesses, promotional agencies,

---

[3] The court has approved certain redactions to the transcripts of the preliminary injunction hearing that the parties requested. However, to the extent such redactions relate to publicly disclosed information, the court may refer to such information in this order. For example, this compensation figure is referenced in HCC's amended complaint. See doc. no. 82 at 5 of 25.

and brokers that had active business relationships with HCC.[4]  In some cases, Woodbury succeeded in enticing entities to work with PPI over HCC.  Regarding confidentiality, HCC alleges that Woodbury has used HCC's confidential information without authorization, by copying HCC policy language for PPI's policies, and by using his knowledge of HCC's pricing practices to undercut HCC's prices.  HCC further alleges that PPI has encouraged Woodbury to violate his noncompete and nondisclosure restrictions.

In its amended complaint, HCC raises claims for specific performance of the 1996 Agreement and 2001 Release (Count I); breach of the 1996 Agreement by Woodbury (Count II); breach of the 2001 Release by Woodbury (Count III); misappropriation of trade secrets by both defendants (Count IV); tortious interference with the 1996 Agreement and 2001 Release by PPI (Count V); a declaratory judgment that the 1996 Agreement and 2001 Release are valid and enforceable (Count VI); and a claim against both defendants under the New Hampshire Consumer Protection Act (Count VII).

---

[4] HCC also claims that Woodbury travelled to London to meet with reinsurers and establish reinsurance arrangements for PPI.

III.  <u>Preliminary Injunction Hearing</u>

The court now summarizes the relevant testimony and evidence presented by the parties at the preliminary injunction hearing.  The court organizes the testimony and evidence chronologically, by witness.

a. <u>Defendant John Woodbury</u>

Woodbury began working at HCC in 1992, after serving as an intern at the company.  Woodbury described his tenure at HCC as one involving a steady increase in responsibilities, authority, and pay.  He first held the position of risk analyst.  Woodbury described the position as involving "special projects" as well as administrative work.  He would create spreadsheets, conduct research on different risks, perform data entry, and answer phones.  By 1994, he was working in the prize indemnity market, preparing and proofreading policies, conducting research, and coordinating with reinsurers on policies.

Woodbury became an account manager in 1995.  As an account manager, Woodbury's principal tasks were to manage client relationships and analyze risks.  Generally, Woodbury testified that his basic duties and expectations over the next two decades remained the same—assess risks, manage clients, and, to a lesser degree, market the company—but that the scope and autonomy of his duties increased and "evolved" over time.  That is, as he

was promoted, he had more autonomy in assessing risks, issuing policies, managing accounts, and generating business.  In addition, his responsibility to generate business became a more central part of his job over time.

At the hearing, Woodbury downplayed the nature and extent of his responsibilities as an account manager in 1996.  He asserted that generating business was not a significant duty— rather, the company handled the marketing—and that his responsibilities were more circumscribed and subject to oversight than in later years.  The evidence supporting Woodbury's claim is mixed.  On the one hand, there is evidence that, in September 1996, his responsibilities of preparing quotes, issuing policies, and conducting marketing in the three relevant product categories required the approval of superiors.  But there is also evidence that, by February 1997, Woodbury was managing the prize indemnity, contractual bonus, and over-redemption division, administering hundreds of accounts, creating new promotional ideas, and assessing complex risks.

Regardless of the exact time at which he became involved in generating business, Woodbury testified that HCC took active steps to assist Woodbury in marketing the company.  During Woodbury's tenure, HCC hired a marketing consultant, joined a promotional marketing association, and reimbursed Woodbury for expenses associated with cultivating and maintaining client

relationships—for example, by reimbursing Woodbury for the cost of dinners with HCC clients.  Woodbury came to develop strong relationships with businesses, brokers, and promotional agencies, some of whom would run the same promotion, and obtain the same insurance from HCC, year after year.  In Woodbury's words, these clients simply "liked working with me," which Woodbury attributed to his professionalism and honesty.  As a result, Woodbury had intimate knowledge of certain repeat promotions.

In 2001, HCC promoted Woodbury to senior vice president, the position he would hold until his resignation.  In that role, Woodbury came to oversee his division, handle more and larger accounts, and underwrite policies on his own authority.

With respect to the 2001 Release, Woodbury testified that, while he does not recall executing it, he does not dispute its authenticity.  He testified that he did receive payments as a result of the 2001 acquisition of ASU International by HCC's parent company, totaling more than $200,000 over the course of several years.[5]  In addition to those payments, Woodbury also executed two stock option agreements with HCC's parent company in 2001 and 2007.  These stock option agreements contained clauses requiring Woodbury to forfeit any gains he made from the

---

[5] See note 3, supra.

agreements if he competed against, or misused the confidential information of, HCC within one year of his termination.

Beginning in January 2016, Woodbury discussed the possibility of moving to Buttine with Rejean Audet, one of Buttine's principals.[6]  They had multiple meetings, the exact content of which Woodbury could not recall at the hearing. Documentary evidence, such as email correspondence, sheds some light on the content of those discussions.  At a meeting in late January, Woodbury disclosed details of his work at HCC, including (1) the percentage of clients he had that were businesses and the percentage that were intermediaries like promotional agencies and brokers; (2) his expectation for the amount of business he could underwrite at Buttine; (3) the fact that he was the only point person at HCC for a substantial portion of his clients; and (4) his overall "book of business" at HCC.

There was also evidence that, during these negotiations, Woodbury pitched his potential move to Buttine as one where Buttine was essentially buying a "book of business," which Woodbury estimated could amount to $3-$5 million in gross premiums.  At the hearing, Woodbury narrowly defined a "book of business" to mean "business that would want to work with me." He testified that he would not be taking clients away from HCC

---

[6] The court refers to Buttine and PPI interchangeably, employing one name over the other where context requires.

once he sought out their business for Buttine, because those clients were free to choose their insurer.

As part of Woodbury's negotiations with Audet, Buttine hired an attorney to examine the 1996 Agreement. Woodbury testified that, despite his belief that the 1996 Agreement was not enforceable, he was concerned that HCC would attempt to enforce it. Prior to resigning from HCC, Woodbury reviewed his personnel file; neither the 2001 Release nor the stock option agreements were in that file.

The documentary evidence suggests that, by May 2016, Woodbury had agreed to join Buttine and run PPI. Woodbury testified that his final employment agreement with PPI tied his compensation to the revenue he generated. Woodbury agreed that, by joining PPI, he would "probably be competing" with HCC.

On the morning of June 30, 2016, Woodbury delivered a resignation letter to William Hubbard, chairman of HCC, and notified Hubbard that he accepted a position at Buttine. Woodbury intended for his resignation to be effective as of July 8, 2016. After learning of Woodbury's resignation, Matthew Overlan, then HCC's chief operating officer, sent two letters to him: one informed Woodbury that his final day would be June 30, not July 8; the other reminded Woodbury of his noncompete and nondisclosure obligations under the 1996 Agreement.

HCC also deposited approximately $12,000 into Woodbury's bank account.[7]  Upon receiving the payment, Woodbury wrote a letter dated July 7, 2016 to Overlan, explaining that he viewed the 1996 Agreement as unenforceable.  Woodbury also informed Overlan that he had returned all HCC documents and files in his possession, and that he would honor his confidentiality obligations.  Believing the $12,000 deposit to be the severance payment to which he was entitled under the 1996 Agreement, Woodbury included a $20,000 check with his letter.  Woodbury explained to Overlan that, in light of the unenforceability of the 1996 Agreement, it would be wrong to accept the deposit.

Woodbury began working at Buttine on July 1.  Buttine officially launched PPI in mid-July, and issued a press release announcing the launch.  The press release states that PPI would be led by Woodbury.

Woodbury testified that, in mid-August 2016, he began contacting businesses with whom he had worked while at HCC.  The record is replete with evidence that Woodbury actively solicited businesses, brokers, and promotional agencies that had longstanding relationships with HCC.  Woodbury testified that he went on to write policies for some of these entities.

---

[7] This amount appears to be the $20,000 severance payment contemplated by the 1996 Agreement, minus withholdings.

Nevertheless, Woodbury denied that, in doing so, he had diverted business from HCC.

Woodbury denied using any of HCC's confidential information while at PPI. The evidence relating to Woodbury's use of confidential information is largely circumstantial. There is evidence that Woodbury retained company information after his resignation. For example, Woodbury conceded that he had compiled a list of email addresses of HCC clients prior to his resignation. He also took cell phone pictures of emails regarding a particular HCC promotion. And, on the day before tendering his resignation, Woodbury took a picture of HCC's 2016 budget with his cell phone. Woodbury could not explain why he took the picture; he conceded that it was not for "HCC business purposes." Finally, Woodbury acknowledged that other HCC information remained on his personal email account and wife's computer even after he left HCC—including communications with HCC clients and a 2011 prize indemnity policy—but he claims this was unintentional.

One piece of compelling circumstantial evidence that Woodbury used confidential information is worth highlighting. Woodbury acknowledged that, in May 2016, he informed HCC executives that his division had incorporated a rate increase with respect to some "hole-in-one" promotions. After joining PPI, Woodbury was able to convince some of those promotions to

work with PPI.  This circumstantial evidence suggests that Woodbury was able to use his knowledge of HCC's pricing to compete against HCC for those clients.

Woodbury professed to have a narrow view of what constitutes confidential information.  Woodbury testified that he did not believe that quotes, pricing, and client lists were necessarily confidential, because "a lot of information is . . . publicly known and publicly transferred," and because some of that information, like an insurance policy, is disseminated to the customer.  Nevertheless, Woodbury conceded that he does not generally share price quotes, client lists, policy terms, premium amounts, or budget information to competitors, and he did not dispute that the 1996 Agreement broadly defined "confidential information" to include such materials.

At the hearing, Woodbury described the specialty insurance market in which he worked while at HCC.  The market is national, rather than regional, and Woodbury would seek out business throughout the country.  He testified that his general task was to assess risks and manage client relationships.  Some clients would run annual promotions and seek out insurance from HCC on a regular basis.  When asked who HCC's client would be in a situation where a promotional agency is acting on behalf of a business to obtain insurance, Woodbury responded that "neither of them would be considered" HCC's client.  He went on to

explain that the business would be the promotional agency's customer, and the promotional agency "acts like a broker and . . . can go to other insurers if they choose to."

Near the end of his testimony, Woodbury emphasized that if he were precluded from working with insurance brokers, it would not only severely harm his business, it would limit brokers' ability to select the insurance executive whose judgment they most trust.

### b. Rejean Audet (President of Buttine)

Rejean Audet is a partner and president of Buttine.  Prior to joining Buttine, Audet worked at HCC.  Audet worked at HCC for four years; he started in 1999 and left in 2003.

Audet came to know Woodbury while working at HCC.  Audet testified that, in late 2015, he reached out to Woodbury about joining Buttine.  That discussion progressed such that, by January 2016, Woodbury had sent Buttine a copy of the 1996 Agreement and Buttine had received evaluations from attorneys regarding the enforceability and effect of the Agreement.  Audet testified that he was not aware of the 2001 Release when Buttine was evaluating whether to hire Woodbury.

An email sent by Audet to Buttine's other partners shows that Buttine intended to hire Woodbury as of January 22.  In the email, Audet sets out his plan for Woodbury's hiring: Buttine

would establish a new division providing prize indemnity, over redemption, and contractual bonus insurance; Buttine would provide Woodbury with administrative, licensing, and legal support; and both Buttine and Woodbury would share in the profits of the business Woodbury developed.  One reasonable inference from this email is that, from the beginning, Audet's recruitment of Woodbury was premised on the idea that Woodbury's role would be to bring HCC's clients to Buttine.  Audet did not dispute that the book of business Woodbury would bring to Buttine would be the business that he had developed while at HCC.  Audet described Woodbury as one of the "two or three biggest names" in this niche market, and he conceded that his intent was that Woodbury would bring the business that he had developed to Buttine.

An email chain between Woodbury and Audet shows that, in May 2016, Buttine and Woodbury reached a final agreement on the terms of Woodbury's employment.  In the email chain, Woodbury states that there would be "no guarantees" regarding the amount of business he could generate "if HCC is playing hardball and undercutting."  Audet testified that he understood Woodbury's point to be that PPI would be in competition with HCC.  Audet also testified that he knew Woodbury was contacting brokers, businesses, and promotional agencies that had relationships with HCC in order to obtain their business for PPI.

Audet testified that, to his knowledge, Woodbury did not bring any confidential information to HCC or use any of HCC's confidential information while at PPI. Audet conceded, however, that during their negotiations he asked Woodbury about the financial results Woodbury had obtained during the prior three years at HCC.

With respect to HCC's allegation that Woodbury had compiled and taken a list of HCC customers, Audet stated that PPI obtained information about potential customers through publicly available sources. Audet believed Woodbury was using that publicly-sourced information to initiate contact with potential customers. Audet also testified that the identities of the brokers and promotional agencies that bring business to insurance companies are "not a secret" in the industry. With respect to HCC's allegations that Woodbury had taken and misused confidential information relating to the terms and structure of various promotions, Audet testified that the broker or promotional agency provides that information to the insurance company.

### c. Robin Lang (Vice President of HCC)

Robin Lang is the vice president of HCC. She has worked at HCC for almost fifteen years, and currently works in the promotions division, which covers prize indemnity, over

redemption, and contractual bonus insurance.  She worked with Woodbury on a daily basis from 2005 until his resignation.

Lang testified about the business of the promotions division generally.  She stated that HCC's clients include brokers, promotional agencies, and businesses holding promotions.  Lang explained that, although insurance policies in the promotions division are generally nonrenewable, HCC develops ongoing relationships with brokers and promotional agencies which creates a likelihood of repeat business.  Lang stated that HCC continues to have "ongoing discussions" with brokers and promotional agencies even when no active policies are in place. Lang testified that, while at HCC, Woodbury was the primary contact for most of the brokers, promotional agencies, and other insureds with whom HCC did business.

Lang also discussed the effect that Woodbury's move to PPI has had on HCC.  In January 2017, Lang first discovered that Woodbury had diverted an HCC client to PPI.  Specifically, Lang testified that when she contacted Creative Promotional Solutions, Inc.,[8] which had previously obtained insurance through HCC for one of its promotions, the agency informed her that it intended to obtain insurance through Woodbury instead.  Then, in February, Lang learned that Woodbury was attempting to take the

---

[8] See note 3, supra; doc. no. 23-1 at 4 of 17.

business of another longstanding promotion by undercutting HCC's pricing. Ultimately, HCC was able to retain that client by reducing its pricing for the promotion. Finally, in March, Creative Promotional Solutions informed HCC that it would be obtaining insurance for a second promotion through Woodbury.

Lang testified that Woodbury's and PPI's actions have had an impact on HCC's business for all three relevant insurance products, and that HCC has lost a number of significant clients to Woodbury and PPI.

### d. Matthew Overlan (CEO of HCC)

Matthew Overlan is HCC's CEO. He summarized the corporate history of HCC. Originally, HCC was named American Sports Underwriters Incorporated. It then changed its name twice, to American Specialty Underwriters Incorporated, and, later, to ASU International, Inc.

In October 2001, HCC Insurance Holdings, Inc. acquired the stock of ASU International. To effectuate the acquisition, a separate corporation—known as HCC-ASU Acquisition Sub, Inc.—was merged into ASU International. Then, in 2005, the surviving corporation, ASU International, changed its name to HCC Specialty Underwriters, Inc. Finally, in 2016, Tokio Marine acquired the stock of HCC's parent company, but HCC remained under the same ownership as it did prior to that transaction.

Overlan testified that the current owner of HCC Specialty Underwriters is an entity within the "HCC group" of companies, though he could not testify to the exact name of the owner.[9]

Overlan also explained the circumstances surrounding the execution of the 2001 Release. At the time HCC's parent company acquired ASU International, ASU International viewed the 1996 Agreement as an enforceable contract. In order to ensure the enforceability of existing noncompete agreements after the acquisition, ASU International had employees, including Woodbury, sign releases. As part of the acquisition, Woodbury received payments in excess of $200,000.

After the acquisition, HCC required some of its employees (not including Woodbury) to sign new noncompete agreements. Overlan explained new noncompete agreements were executed only by employees who received new positions.

### e. William Hubbard (Chairman of HCC)

William Hubbard is HCC's chairman. He has worked at HCC, or one of its predecessors, for nearly thirty years. He has known Woodbury since Woodbury joined HCC as an intern. Hubbard

---

[9] On cross-examination, defendants' counsel questioned Overlan about a number of putative inconsistencies in the record relating to HCC's corporate history. For the sake of brevity, the court does not recount that exchange here. The court credits Overlan's testimony regarding HCC's corporate history. See also note 2, supra.

testified that, during Woodbury's tenure, Woodbury reported to him, either directly or indirectly.

Hubbard explained his understanding of HCC's business with respect to the three relevant insurance products.  Although the promotions insurance business can "bounce[] up and down," HCC maintains business relationships with brokers and promotional agencies regardless of whether there is an active policy in place.  In Hubbard's words, the industry is "nichey" and "specialized," and the relationships forged with brokers and promotional agencies are critical.  HCC generates relationships within the industry by joining associations, "knocking on doors," and "performing for an entity," which HCC can then build on over time.  HCC also generates "good will" by reducing prices or paying a questionable claim, which "goes a long way" to forging a relationship with a client.  Hubbard stated that one of Woodbury's responsibilities was to develop his client base and HCC's good will, and, to that end, HCC would reimburse Woodbury for his efforts.  Nevertheless, Hubbard testified that he could not recall any significant clients that Woodbury generated through his own initiative.  In contrast, Hubbard claimed that HCC generated a number of clients through its various marketing strategies.

Hubbard discussed Woodbury's role within HCC from the time he signed the 1996 Agreement to his resignation.  Hubbard

testified that Woodbury's general job duties and
responsibilities did not change during that period.  He stated
that, during one period in 1996, Woodbury was subjected to
additional oversight from superiors because Woodbury was
"floundering" in administrative and organizational matters, but
that those restraints were lifted by 1997.  HCC never put in
place a new noncompete agreement with Woodbury because his job
did not change.  HCC's general practice was to require a new
noncompete agreement only if an employee's duties changed.

Hubbard acknowledged that, at the time of Woodbury's
resignation, Woodbury informed him that he intended to join PPI.
Hubbard claimed that he did not know in the fall of 2016 that
Woodbury was taking business from HCC.  Hubbard could not deny,
however, that HCC's November 2016 complaint alleges that
Woodbury was attempting to solicit HCC's clients.

Regarding Woodbury's confidentiality obligations, Hubbard
testified that, when Woodbury resigned, he trusted Woodbury and
did not believe Woodbury would violate his confidentiality
obligations.  Hubbard did not know at that time that Woodbury
had retained HCC's confidential information on his personal
computer, compiled a list of client contacts, or taken a cell-
phone picture of HCC's budget.

Hubbard estimated that if Woodbury took $3 to $5 million of
HCC's business—the amount Woodbury estimated he could generate

for PPI—the prize and promotion business at HCC would be cut in half.

### f. Robert Hamman (CEO of SCA Promotions)

Robert Hamman is the CEO of SCA Promotions, Inc., a promotional agency that has worked with HCC and, more recently, PPI. Defendants called Hamman as a witness, who testified via video. SCA Promotions is one of the HCC clients whose business, according to Lang, Woodbury diverted to PPI.

Hamman testified that SCA Promotions sometimes acted as a competitor to HCC, and at other times coordinated with HCC on particular promotions. He explained that he did not consider SCA Promotions to be a client of HCC. Rather, he generally viewed HCC as a competitor, because HCC and SCA Promotions would compete for the business of entities holding promotions. Hamman testified that, on occasion, HCC and SCA Promotions would work together to share the risk of a particular promotion, but Hamman viewed that relationship as one more akin to insurer-reinsurer, rather than insured-insurer. When seeking to obtain a quote for insurance, Hamman would generally provide details of the risk and his appraisal of the risk to the insurance company.

Hamman met Woodbury while Woodbury was working for HCC. Hamman testified that he trusts Woodbury's insight and judgment. He conceded that he has worked with Woodbury on some promotions

since Woodbury has moved to PPI.  Hamman does not believe that
he has brought any business to HCC since Woodbury left, and he
testified that he would like to continue working with Woodbury.

### g. Timothy O'Meara (Owner of Creative Promotional Solutions)

Timothy O'Meara runs Creative Promotional Solutions, a
promotional agency.  Defendants called O'Meara as a witness.
O'Meara has worked with Woodbury on various promotions, both
while Woodbury was at HCC and in his current position at PPI.
In total, O'Meara has worked with Woodbury on a regular basis
for thirteen years.

O'Meara testified that Creative Promotional Solutions would
obtain a policy from an insurance company to cover the risk that
it undertook as part of running a promotion for a business.  In
that capacity, Creative Promotional Solutions would be the named
insured.

O'Meara testified that he learned about Woodbury's
resignation from one of O'Meara's employees.  O'Meara then
contacted Woodbury through LinkedIn and learned about Woodbury's
move to PPI.  Thereafter, O'Meara asked Woodbury to provide a
quote for a particular promotion.  O'Meara stated that he sent
Woodbury a spreadsheet containing details about the promotion,
expected risks, and the pricing he wanted from PPI.  O'Meara
rejected the claim that Woodbury could be undercutting HCC's

prices, because it is Creative Promotional Solutions that sets the pricing it wants for insurance. O'Meara maintains a record of the history of his promotions, which he uses to set prices for his promotions. O'Meara testified that he valued Woodbury's work and trusted Woodbury's judgment, and would like to continue to work with him.

## DISCUSSION

HCC seeks a preliminary injunction against defendants requiring them to abide by the noncompete and nondisclosure restrictions set forth in the 1996 Agreement.[10] HCC argues that it is entitled to injunctive relief against Woodbury on the basis of Woodbury's breaches of the 1996 Agreement and the 2001 Release, as well as his violation of the CPA. HCC asserts that PPI should be enjoined on the basis of its tortious interference with those agreements, and its violation of the CPA. The court begins by addressing the claim for breach of the 1996 Agreement.

---

[10] Specifically, HCC asks the court to enjoin Woodbury from diverting or attempting to divert business from HCC, interfering in any material respect with HCC's business relationships, or rendering any services to another who is diverting HCC's business or interfering with HCC's business relationships. HCC likewise requests that the court enjoin PPI from diverting business from HCC or interfering with HCC's business relationships. Finally, HCC asks the court to enjoin both defendants from using or disclosing HCC's confidential information and trade secrets.

I.   <u>Breach of the 1996 Agreement by Woodbury</u>

HCC asserts that it has shown a likelihood of success on its first breach of contract claim, because Woodbury has been breaching his noncompete and nondisclosure obligations under the 1996 Agreement since he joined PPI.  HCC argues that these breaches will continue to cause it irreparable injury, specifically in the form of a substantial loss of business, lost good will, and the unauthorized use of confidential information. Finally, HCC contends that the equities and the public interest favor the issuance of a preliminary injunction.

Defendants disagree that injunctive relief is appropriate. On the likelihood of success factor, defendants assert that the 1996 Agreement is unenforceable because (1) the Agreement lacked adequate consideration; (2) the Agreement is overbroad and vague; (3) the employment relationship between Woodbury and HCC changed materially between 1996 and 2016; and (4) the 2001 and 2007 stock option agreements supersede the 1996 Agreement.[11]

---

[11]   Defendants make two other arguments that merit only brief comment.  First, Defendants argue that the 1996 Agreement was unlawfully assigned to HCC.  Defendants' argument fails because, as discussed in note 2, <u>supra</u>, HCC is likely to show that HCC is the same entity as American Specialty Underwriters, Inc.  Second, to the extent defendants assert that the 1996 Agreement is unenforceable because Woodbury executed it under duress, the court does not find credible Woodbury's claim that he was pressured to sign the Agreement.

Defendants also argue that HCC cannot demonstrate irreparable injury. They stress that HCC waited over four months after it learned that Woodbury intended to join PPI to bring the present action, and then waited over another six months to file a motion for a preliminary injunction. Defendants also claim that the economic harm that HCC alleges it has suffered (and continues to suffer) does not constitute irreparable injury. In addition, defendants argue that the equities and public interest disfavor injunctive relief, because an injunction would prevent Woodbury from being able to work and would inhibit innocent third parties from working with their preferred insurance company.

The court first concludes that the 1996 Agreement is likely valid and enforceable, and that HCC has shown a likelihood of success on its claim that Woodbury has breached the 1996 Agreement. Even so, the court declines to grant injunctive relief with respect to both sets of restrictions. The court will only grant injunctive relief precluding Woodbury from disclosing or using HCC's confidential information. The court will not grant a preliminary injunction requiring Woodbury to abide by the noncompete restrictions in the 1996 Agreement. As will be discussed more fully below, this is because HCC has not demonstrated that the two factors of irreparable injury and the

equities favor an injunction requiring Woodbury to abide by the noncompete restrictions in the 1996 Agreement.

a. Likelihood of Success

i. Validity of 1996 Agreement

The 1996 Agreement provides that it is governed by Massachusetts law.[12]  "To establish a breach of contract under Massachusetts law, the plaintiff must demonstrate that: (1) a valid, binding agreement exists; (2) the defendant breached the terms of the agreement; and (3) the plaintiff suffered damages from the breach."  Atlantech Inc. v. Am. Panel Corp., 540 F. Supp. 2d 274, 284 (D. Mass. 2008).  In general, "[t]he elements of a valid contract are an offer, acceptance, and an exchange of consideration or a meeting of the minds."  Bosque v. Wells Fargo Bank, N.A., 762 F. Supp. 2d 342, 351 (D. Mass. 2011).

In addition, Massachusetts law subjects restrictive covenants to greater scrutiny.  Such a contract is only enforceable if "it is necessary for the protection of the employer, is reasonably limited in time and space, and is

_____

[12] HCC argues that, based on the 2001 Release, Delaware law should control the court's analysis.  However, because it would not appear to materially alter the court's analysis, the court need not decide which state's law governs at this juncture.  See Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 158 (1st Cir. 2005).

consonant with the public interest." Ferrofluidics Corp. v.
Advanced Vacuum Components, Inc., 968 F.2d 1463, 1468-69 (1st
Cir. 1992) (internal quotation marks omitted).  A restrictive
covenant that does not meet these requirements will not be
deemed wholly unenforceable, however.  Rather, Massachusetts
courts "will enforce [the agreement] to the extent that it is
reasonable."  Id. at 1469.

        The 1996 Agreement meets the basic requirements for a valid
contract.  As the record makes clear, there was an offer,
acceptance, and a meeting of the minds.  In addition, the court
concludes there was adequate consideration.  A number of courts
have held that, under Massachusetts law, "continued employment
alone may suffice to support non-competition or other
restrictive covenants."  Optos, Inc. v. Topcon Med. Sys., Inc.,
777 F. Supp. 2d 217, 231 (D. Mass. 2011) (collecting cases).
But see IKON Office Sols., Inc. v. Belanger, 59 F. Supp. 2d 125,
131 (D. Mass. 1999) (holding that continued employment did not
constitute sufficient consideration for restrictive covenant).
Beyond his continued employment, however, under the 1996
Agreement Woodbury would also receive severance compensation
upon termination of his employment.  Taken together, there was
sufficient consideration to support the 1996 Agreement.  See,
e.g., Marine Contractors Co., Inc. v. Hurley, 310 N.E.2d 915,

919 (Mass. 1974) (acceleration of $12,000 in deferred payments to employee was adequate consideration for noncompetition agreement).

The court next concludes that the additional requirements for restrictive covenants pose no obstacle to the enforcement of the 1996 Agreement.  Defendants argue that the 1996 Agreement is overbroad and vague, because, among other things, it extends for two years, contains no limitations as to geography, and is unclear as to what terms like "diverting business" and "policy holder" mean.

Even if accepted, however, defendants' arguments would not render the 1996 Agreement unenforceable.  As noted above, under Massachusetts law, a court may enforce an overly broad restrictive covenant "to the extent that it is reasonable." Advanced Vacuum, 968 F.2d at 1469.  Such a contract is enforceable if it meets the three-part test: (1) it is necessary for the protection of the employer; (2) it is reasonably limited in time and space; and (3) it is consonant with the public interest.  See id. at 1468-69.  Here, HCC has shown a strong likelihood that the 1996 Agreement is reasonable, and therefore enforceable, at least insofar as it precludes Woodbury from

soliciting business from any current HCC policy holder (the "nonsolicitation provision").[13]

First, the nonsolicitation provision is necessary to protect HCC's legitimate business interests. Legitimate business interests include the protection of good will and confidential information. See Boulanger v. Dunkin' Donuts Inc., 815 N.E.2d 572, 578 (Mass. 2004). "Good will is generally understood to refer to the benefit and advantage that accrue to a business from its positive reputation in the eyes of its customers and potential customers that enable it to retain their patronage and obtain new business." SimpliVity Corp. v. Moran, No. 142133, 2016 WL 5122671, at *8 (Mass. Super. Ct. Aug. 14, 2016). A former employee with close relationships with clients is in a position to harm the employer's good will because "the close relationship with the employer's customers may cause those customers to associate the former employee, and not the employer, with the product and services delivered to the customer through the efforts of the former employee." Id.

---

[13] Because the court is declining to issue a preliminary injunction with respect to the noncompete restrictions, the court need not definitively determine whether the 1996 Agreement is overbroad and, if so, to what extent the Agreement should be enforced. It suffices to say that HCC has shown a strong likelihood that the 1996 Agreement is enforceable against Woodbury at least in part.

Here, Woodbury was employed by HCC in part to develop and maintain close, positive relationships with HCC's clients, and Woodbury appears to have been successful in that respect. But through those close relationships, Woodbury could misappropriate HCC's good will because clients would attribute—and indeed, appear to have attributed—the quality of service they received to Woodbury, and not to HCC. The nonsolicitation provision is a necessary and reasonable means to protect HCC's accrued good will.[14] See id. at 11 (concluding that regional sales manager's restrictive covenant was necessary to protect company's good will); Kroeger v. Stop & Shop Cos., Inc., 432 N.E.2d 566, 570 (Mass. App. Ct. 1982).

Similarly, pursuant to the 1996 Agreement, Woodbury understood that he would obtain confidential information during the course of his employment, and he agreed that confidential

---

[14] Defendants assert that the good will Woodbury accrued during his employment belongs to him, not to HCC. The court disagrees. This is not a case where an employee develops good will independently of his employer; Woodbury managed relationships with clients on behalf of HCC, and HCC paid Woodbury a salary and bonuses, and reimbursed his expenses, so that he would cultivate those relationships. In addition, the record suggests that it was HCC that generally made the initial efforts to obtain new clients. Therefore, the good will belongs to HCC. See Lombard Med. Techs., Inc. v. Johannessen, 729 F. Supp. 2d 432, 439 (D. Mass. 2010) ("When the employer introduce[s] the client to the salesman or the salesman cultivated his relationship with the client while employed by the employer, the good will belongs to the employer." (internal quotation marks omitted)).

information included customer lists, financial and commercial
data, policy language and premium data, and HCC's financial
records.  The evidence at the hearing establishes that Woodbury
had knowledge of, and access to, troves of sensitive business
information.  Accordingly, the nonsolicitation provision of the
1996 Agreement reasonably serves to protect HCC against the risk
that Woodbury could use HCC's confidential information
competitively.  See Boulanger, 815 N.E.2d at 578-79 (concluding
that restrictive covenant against franchisee served franchisor's
legitimate business interest in protecting confidential
information).

Second, the nonsolicitation provision is reasonably limited
in time and space.  Many courts have held that a two-year
restrictive covenant is reasonable.  See id. at 579 (collecting
cases); Aspect Software, Inc. v. Barnett, 787 F. Supp. 2d 118,
128 (D. Mass. 2011) (same).  Particularly in this industry,
where clients may not obtain insurance every year, a two-year
restrictive covenant is a reasonable means to protect HCC's good
will.  And although the nonsolicitation provision contains no
geographic limitation, it is reasonable because it is limited to
current policy holders and clients.  See Emery v. Merrimack
Valley Wood Prods., Inc., 701 F.2d 985, 989-90 (1st Cir. 1983)
(under New Hampshire law, restrictive covenant that restricted

employee from working with recent customers, rather than imposing a geographic limitation, was reasonable).

Third, the nonsolicitation provision is consonant with the public interest.  "[T]he public has a legitimate interest in ensuring that legally enforceable contracts are enforced." Get in Shape Franchise, Inc. v. TFL Fishers, LLC, 167 F. Supp. 3d 173, 200 (D. Mass. 2016).  Indeed, "[a]s a matter of long-standing Massachusetts case law, it is beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent." Corp. Techs., Inc. v. Harnett, 943 F. Supp. 2d 233, 245 (D. Mass. 2013) (internal quotation marks omitted).

Opposing considerations do not outweigh this interest.  Given its limited scope, the nonsolicitation provision does not unduly interfere with any public interest in liberty of employment, as Woodbury is free to obtain business from all but a specific pool of potential customers.  See Boulanger, 815 N.E.2d at 581 (rejecting argument that reasonably circumscribed restrictive covenant harms "the public interest in liberty of employment").

Nor does the nonsolicitation provision offend any putative public interest in free consumer choice.  Such an interest is more salient in the context of fiduciary relationships like that of a doctor and patient or a lawyer and client.  See McFarland

v. Schneider, No. 96-7097, 1998 WL 136133, at *44-45 (Mass. Super. Ct. Feb. 17, 1998).  In contrast, the record shows that in this specialty insurance market, the clients are generally sophisticated businesses, and the record does not establish that the relationship between insurer and insured rises to such a level of reliance, intimacy, or confidence.  See id. (rejecting argument that interest in an institutional investor's right to choose investment advisor precluded enforcement of restrictive covenant).

Therefore, HCC will likely show that the nonsolicitation provision of the 1996 Agreement is a valid and reasonable restrictive covenant under Massachusetts law.

### ii. Other Arguments on the Enforceability of the 1996 Agreement

Having reached the conclusion that the 1996 Agreement is valid, at least in part, the court turns to defendants' two remaining arguments.  Defendants contend that the 1996 Agreement is unenforceable because of the material-change doctrine and because the Agreement was superseded by two stock options agreements that Woodbury executed.  The court examines each argument in turn.

## 1. Material-Change Doctrine

"[U]nder Massachusetts law, each time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed." Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 16 (1st Cir. 2009) (internal quotation marks and brackets omitted). The First Circuit has interpreted the doctrine to apply where the employment agreement has been "mutually abandoned and rescinded." Id. (internal quotation marks omitted). In other words, the question is whether the conduct of the parties shows that "they had abandoned and rescinded by mutual consent the earlier employment agreement containing the pertinent non-compete provision and had entered into a new employment relationship that included no such non-compete provision." Id. Courts have considered a number of factors in making this determination, including the nature and extent of the changes to employment, and whether the employer sought to have the employee sign a new non-compete agreement at the time of the employment change. See F.A. Bartlett Tree Expert Co. v. Barrington, 233 N.E.2d 756, 758 (Mass. 1968); Grace Hunt IT Sols., LLC v. SIS Software, LLC, No. 201200080BLS1, 2012 WL 1088825, at *4 (Mass. Super. Ct. Feb. 14, 2012).

In this case, the court concludes that HCC has demonstrated
that the material-change doctrine does not apply.  While it is
clear Woodbury's title changed from 1996 to 2016—from account
manager to, ultimately, senior vice president—there is
conflicting evidence regarding the extent to which his
responsibilities and underlying role changed within the company.
As a whole, however, the record suggests that Woodbury's basic
duties remained consistent through his promotions, but that the
level of autonomy, supervisory authority, responsibility, and
salary that he enjoyed steadily increased over time.  These
changes could arguably lend support to either position.

The intent of the parties becomes clearer in light of their
subsequent conduct, however.  Hubbard and Overlan credibly
testified that HCC's practice was to require a new noncompete
agreement when an employee changed positions, and there was
evidence that other HCC employees did execute new restrictive
covenants when they changed positions.  But HCC never required
Woodbury to sign a new noncompete agreement despite his
promotions.  In fact, under the 2001 Release, Woodbury
reaffirmed his obligations under any applicable noncompete or
nondisclosure agreement.  These facts suggest that the parties
operated under the belief that the 1996 Agreement remained in
force notwithstanding Woodbury's promotions.  Thus, on balance,
the court concludes that HCC will likely show that the material

change doctrine does not render the 1996 Agreement
unenforceable.

### 2. Enforceability of 1996 Agreement in light of Subsequent Agreements

Finally, the court is not persuaded by defendants' argument
that the 1996 Agreement was superseded by the 2001 and 2007
stock option agreements.  "In order for a contract to operate as
a rescission of a former agreement, its terms must fully cover
the subject matter of the original agreement." 29 Williston on
Contracts § 73:17 (4th ed.).  The question is one of the
parties' intent.  See id.  In this case, not only do the stock
option agreements relate to a different subject matter than the
1996 Agreement, but Woodbury executed the stock option
agreements with HCC's parent company, not HCC.  Consequently,
the court cannot conclude that the parties to the 1996
Agreement, HCC and Woodbury, intended for the stock options
agreements to supersede the terms of the Agreement.

In sum, HCC is likely to show that the nonsolicitation and
nondisclosure provisions of the 1996 Agreement are valid and
enforceable.

### iii.  Breach and Damages

With respect to both the nonsolicitation and nondisclosure
provisions of the 1996 Agreement, HCC is likely to establish the

remaining elements for breach of contract—breach and damages.

See Am. Panel Corp., 540 F. Supp. 2d at 284.

First, HCC is likely to show that Woodbury breached the nonsolicitation provision of the 1996 Agreement, which forbade him from "soliciting [or] attempting to solicit" HCC's policy holders and clients.  Doc. no. 82-1 at 4 of 5.  There is abundant evidence that shortly after joining PPI, Woodbury began soliciting entities that were current policy holders of HCC. Woodbury conceded that he went on to do business with some of the entities with whom he was in contact.  Indeed, this was the evident purpose of Woodbury's move to PPI—he would take the business that he had managed at HCC to PPI, and, in exchange, he would receive part of the revenue such business generated. Woodbury's conduct violates the 1996 Agreement's proscription against solicitation.  Furthermore, there was sufficient evidence to draw the inference that Woodbury's actions caused HCC to lose potential business opportunities from its clients, resulting in damages.

Second, HCC is likely to show that Woodbury has misused and disclosed HCC's confidential information.  Although the parties do not wholly agree on what constitutes confidential information, there are some types of information that clearly fall within the definition of "confidential information" under

the 1996 Agreement. These include customer lists, HCC's budget information and financial data, and pricing and premium data.

There is evidence that Woodbury has misused or disclosed these types of confidential information. For example, in May 2016, Woodbury knew that HCC had incorporated rate increases for entities running hole-in-one promotions, and he went on to obtain business from some of those promotions when he joined PPI. The court finds reasonable the inference that Woodbury used his knowledge of HCC's pricing to set more favorable premiums and obtain the business of such promotions. Other examples exist in the record: Woodbury compiled a list of client email addresses prior to leaving HCC, and he subsequently contacted some of the clients on that list. On the day before he left HCC, Woodbury took a picture of HCC's 2016 budget information—an act which Woodbury admitted he did not do for "HCC business purposes." Furthermore, Woodbury disclosed basic financial information to PPI during his employment negotiations, including the overall mix of HCC's clients, the revenue he generated at HCC, and the fact that he was the only point person at HCC for a substantial portion of those clients. Based on this evidence, HCC is likely to show that Woodbury misused and disclosed HCC's confidential information.

To be sure, much of this evidence does not directly demonstrate that Woodbury has misused or disclosed HCC's

confidential information, and Woodbury denies that he has done so. The court is skeptical of Woodbury's assertion. In the first place, Woodbury articulated an extremely narrow view of "confidential information" during his testimony. But more to the point, his demeanor at the hearing, as well as his general inability to forthrightly answer questions posed to him, gives the court serious pause. At this juncture, and based on the record before it, the court concludes that HCC will likely show that Woodbury misused and disclosed HCC's confidential information in violation of the 1996 Agreement, and that such use and disclosure caused HCC damages.

In sum, HCC has demonstrated a likelihood of success on its claim that Woodbury breached the 1996 Agreement, both by soliciting HCC's clients and by using and disclosing HCC's confidential information.

b. Irreparable Injury

The court now examines whether HCC has demonstrated irreparable injury. HCC argues that Woodbury's ongoing breaches of the noncompete provisions constitutes irreparable harm in itself, and it also asserts that it will suffer irreparable harm in the form of misappropriated good will, lost clients and business, and the unauthorized use and disclosure of its confidential information.

As discussed above, defendants argue that HCC cannot satisfy the element of irreparable injury because HCC waited over ten months from the time it learned of Woodbury's move to file a motion for a preliminary injunction, and because the alleged economic harm is compensable through money damages. HCC responds that any delay is excusable and the harms it will suffer cannot be remedied through monetary relief.

The court divides its analysis of irreparable injury into two sections, one relating to Woodbury's alleged violation of his noncompete obligations,[15] and the other relating to his violation of the nondisclosure provision of the 1996 Agreement.

### i. Noncompete Obligations

The court concludes that HCC has not demonstrated irreparable injury with respect to its claim that Woodbury has breached the noncompete provisions of the 1996 Agreement.

As an initial matter, HCC is correct in arguing that the types of harms it alleges (e.g., the violation of a restrictive covenant, lost good will, unauthorized use of confidential information) can constitute irreparable injuries. See, e.g., Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13

---

[15] Although the court analyzed the factor of likelihood of success only as it relates to the nonsolicitation provision, to give full consideration to HCC's arguments, the court considers all of the noncompete restrictions in assessing the remaining factors for a preliminary injunction.

(1st Cir. 2000); Harnett, 943 F. Supp. 2d at 242-43. This is
because it can be "extraordinarily difficult" to quantify in
dollars the harm caused by the misuse of confidential
information or a company's good will. Harnett, 943 F. Supp. 2d
at 243; see also Baccarat, Inc., 217 F.3d at 13. Further, HCC
relies on the inevitable disclosure doctrine to support its
claim of irreparable harm. Under this doctrine, a party may
establish irreparable harm on the theory that a former
employee's "new employment will inevitably lead him to rely on
his knowledge of the plaintiff's trade secrets." Harnett, 731
F.3d at 14; see also U.S. Elec. Servs., Inc. v. Schmidt, No. 12-
10845-DJC, 2012 WL 2317358, at *8 (D. Mass. June 19, 2012)
(collecting cases).

Nevertheless, the issue of whether these alleged injuries
can be irreparable is distinct from HCC's burden here—to show
that it "will suffer irreparable injury absent the injunction."
Latin Am. Music Co. v. Cardenas Fernandez & Assocs., Inc., 2 F.
App'x 40, 42 (1st Cir. 2001) (emphasis added). The court
concludes that HCC has not met its burden.

The court reaches this conclusion based primarily on HCC's
delay in bringing the present motion. Courts have often held
that "[a] long delay by plaintiff after learning of the
threatened harm . . . may be taken as an indication that the
harm [is] not . . . serious enough to justify a preliminary

injunction." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2948.1 (3d ed. 2013). As the First Circuit has noted, a delay "between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004). Put differently, "[i]f a plaintiff has already been subjected to the putative harm caused by the defendants' conduct for a significant period of time, he or she cannot credibly argue that pressing hardship requires injunctive relief in the interim before the underlying matter is resolved." Taylor v. Biglari, 971 F. Supp. 2d 847, 853 (S.D. Ind. 2013).

In this case, HCC did not file the present action until November 15, 2016, and then waited until May 24, 2017 to file a motion for a preliminary injunction. All told, HCC waited more than ten months after learning of Woodbury's move to PPI to seek preliminary injunctive relief.

But HCC argues that its delay is excusable because it moved for a preliminary injunction "when it became evident that irreparable harm would ensue if an injunction did not issue." Doc. no. 67 at 37 of 39. At the hearing, Lang and Hubbard (at least initially) testified to similar effect, stating that they

47

did not know of Woodbury's competitive activities until early 2017.

The record does not support HCC's claim. HCC knew on the day of Woodbury's resignation that he intended to go to Buttine. Shortly thereafter, Woodbury informed HCC that he did not believe the 1996 Agreement was enforceable, and Buttine issued a press release announcing the new division, headed by Woodbury, which would offer competing insurance products. Defendants' intent, and the risk PPI posed to HCC, was evident by July or August 2016. Indeed, to the extent HCC claims that Woodbury would inevitably disclose confidential information at PPI, such harm would have been evident to HCC in the summer of 2016 as well. Even at the latest, HCC was aware of defendants' activities in November 2016: that is when HCC filed the present complaint, in which it alleged that Woodbury had gone to PPI to "operate a directly competing business," had met with HCC clients, and "ha[d] breached and continues to breach" the 1996 Agreement. Doc. no. 1 at 1, 5, 10 of 20. Standing alone, a delay of this length undercuts HCC's claim of irreparable harm. See, e.g., Health New England, Inc. v. Trinity Health – New England, Inc., No. 15-30206-MGM, 2016 WL 4925780, at *4 (D. Mass. Sept. 14, 2016) (no presumption of irreparable harm would apply in trademark infringement suit, given ten-month delay between discovery of claim and filing of motion); Share Corp. v.

*Momar Inc.*, No. 10-CV-109, 2010 WL 933897, at *6 (E.D. Wis. Mar. 11, 2010) (no irreparable harm where plaintiff learned in spring 2009 that former employees had joined competitor but did not file suit for breaches of restrictive covenants until February 2010).

The court finds the delay even more significant when viewed from the perspective that, in effect, HCC waited almost half of the length of Woodbury's two-year noncompete agreement to seek relief. HCC's failure to timely enforce the noncompete restriction—which HCC claims is the critical mechanism by which it can protect its good will and confidential information—is inconsistent with its assertion that it faces irreparable damage if an injunction does not issue.[16]

---

[16] HCC may have been operating under the view that it could obtain an extension of the noncompete agreement. As part of the relief it seeks, HCC requests that any preliminary injunction "run from the date that the Court's order issues." Doc. no. 67 at 38 of 39. It relies on a case applying Massachusetts law, which states that such relief is necessary to prevent the employee from "shorten[ing] the running of the contractual time period." *Id.* (quoting *Harnett*, 943 F. Supp. at 243-44). The court disagrees with that proposition. The First Circuit has held that, under Massachusetts law, "when the period of restraint has expired . . . specific relief is inappropriate and the injured party is left to his damages remedy." *EMC Corp. v. Arturi*, 655 F.3d 75, 77 (1st Cir. 2011) (quoting *A-Copy, Inc. v. Michaelson*, 599 F.2d 450, 452 (1st Cir. 1978)). This rule is strictly applied, and holds "even when the delay was substantially caused by the time consumed in legal appeals." *Id.*

An additional consequence flows from HCC's delay: HCC's injuries are no longer speculative. As it stands now, Woodbury has contacted and solicited an identifiable pool of businesses, brokers, promotional agencies, and reinsurers. Any injuries resulting from Woodbury's competitive activities are now concrete, and the damages flowing from Woodbury's actions are likely to be quantifiable. See, e.g., Harnett, 943 F. Supp. 2d at 244 (stating that, where former employee had already consummated agreement with customer, "any future harm flowing from that contract can be quantified on the basis of the value of the contract and will be compensable in monetary damages"); Belanger, 59 F. Supp. 2d at 132 ("The possible loss of customers through improper solicitation may not constitute irreparable injury when damages for such losses are available.").

Therefore, with respect to the noncompete restrictions in the 1996 Agreement, HCC has not demonstrated that it will suffer irreparable harm absent the injunction.

ii. <u>Nondisclosure Obligations</u>

The same analysis does not obtain with respect to the nondisclosure restrictions in the 1996 Agreement. The court is satisfied that HCC's delay in seeking to enforce those restrictions is excusable. As the record shows, soon after he resigned Woodbury told HCC that he would still abide by the

restrictions relating to confidentiality under the 1996 Agreement.  Thus, unlike Woodbury's competitive activities, HCC was not put on notice of a potential violation of the nondisclosure restrictions.  Nor was Woodbury's misuse of confidential information immediately apparent to HCC.  Indeed, in its November 2016 complaint, the only evidence of misuse HCC alleged was that Woodbury had engaged in "abnormal activity" on his HCC work computer shortly before his resignation.  Doc. no. 1 at 11 of 20.  In addition, unlike the noncompete provisions, the nondisclosure restrictions contain no temporal limitation.  For these reasons, HCC's delay is excusable.

Further, HCC has demonstrated that it will incur irreparable injury absent an injunction to enforce the nondisclosure restrictions.  The misuse of confidential information can, and in this case does, constitute irreparable harm.  See, e.g., Harnett, 731 F.3d at 14; Boston Sci. Corp. v. Lee, No. 13-13156-DJC, 2014 WL 1946687, at *6 (D. Mass. May 14, 2014).

### c. Balancing of the Equities

The next factor is the balance of the equities, which concerns the "hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does." Rosario-Urdaz, 350 F.3d at 221.

With respect to the noncompete obligations, HCC has not
demonstrated that the balancing of the equities favors an
injunction.  On the one hand, the record shows that Woodbury has
violated, and will likely continue to violate, the 1996
Agreement.  For HCC, the result of Woodbury's conduct is the
loss of "substantial investments of time, resources, and money
in [its] relationships with . . . clients as well as the
goodwill and reputation it has built up with clients and in the
industry."  Harnett, 943 F. Supp. 2d at 244.  But it appears
that much of the damage has already been done.  Woodbury has
already solicited many HCC clients and interfered with HCC's
business relationships.  Given HCC's delay and the extent to
which Woodbury has already competed against HCC, the degree to
which an injunction would prevent further irremediable hardship
to HCC is unclear.  Further, as noted above, the damages from
Woodbury's conduct appear to be compensable through money
damages.  See Grease Monkey Int'l, Inc. v. Ralco Lubrication
Servs., Inc., 24 F. Supp. 2d 120, 125 (D. Mass. 1998) (noting
that balance of equities tipped against movant in part because
alleged harm was compensable).

On the other hand, the harm to Woodbury is clear.
Considering all of the noncompete provisions in the 1996
Agreement, Woodbury would be enjoined not only from soliciting a
discrete pool of current HCC clients, but he would be precluded

from even doing business with the large number of brokers, reinsurers, and former clients who maintain "business relationships" with HCC. One provision in the 1996 Agreement prohibits Woodbury from even working at PPI so long as PPI engages in certain competitive activities against HCC. It is difficult to see how Woodbury could work in the insurance industry at all, let alone in the specialty insurance market, if an injunction enforcing all of the noncompete restrictions were to issue.[17] See id. (in balancing equities, finding significant the fact that former franchisee's "ability to earn a living in his chosen field would be extinguished or at least substantially curtailed if he were enjoined"). HCC has not shown that the equities favor an injunction.

By contrast, with respect to the nondisclosure obligations, HCC has demonstrated that the equities favor injunctive relief. The harm attendant to the unauthorized use and disclosure of HCC's confidential information is evident from the record and is not similarly calculable. There is little discernible hardship that redounds to Woodbury if he is prevented from disclosing HCC's confidential information, as he will still be able to work

---

[17] Even if the court were to limit its balancing of the equities to the nonsolicitation provision, which HCC has shown is valid and enforceable, HCC has not established that the equities favor an injunction enforcing just that provision.

and earn a livelihood.  See EMC Corp. v. Arturi, No. 10-40053-FDS, 2010 WL 5187764, at *7 (D. Mass. Dec. 15, 2010).

d. Public Interest

The final factor is the effect of an injunction on the public interest.  Regarding the noncompete obligations, the court finds that this factor weighs in HCC's favor.  There is a public interest in ensuring that enforceable restrictive covenants are enforced.  See Harnett, 943 F. Supp. 2d at 245. Defendants' opposing claim, that there is a public interest in allowing members of the public to choose their preferred insurance underwriter, is less weighty in this industry, where the customers are sophisticated entities, and the business relationships do not entail a high level of reliance or confidence.

Regarding the nondisclosure obligations, this factor weighs strongly in favor of HCC.  There is a public interest in "guaranteeing companies protection for their confidential or proprietary information," and little in the way of a contrary public interest that would disfavor an injunction enforcing the nondisclosure restrictions in the 1996 Agreement.  Arturi, 2010 WL 5187764, at *7.

e. <u>Summary</u>

The court concludes that HCC is likely to succeed on its claim that Woodbury breached the 1996 Agreement, by violating both the nonsolicitation and nondisclosure provisions. However, with respect to Woodbury's breach of the noncompete provisions, HCC has not demonstrated irreparable injury or a favorable balance of the equities. Therefore, the court declines to issue a preliminary injunction requiring Woodbury to abide by the noncompete provisions of the 1996 Agreement.

By contrast, with respect to Woodbury's breach of the nondisclosure provisions of the 1996 Agreement, HCC has demonstrated that the three remaining factors—irreparable injury, a favorable balancing of the equities, and the public interest—support preliminary injunctive relief. Therefore, the court issues a preliminary injunction requiring Woodbury to abide by the nondisclosure provisions of the 1996 Agreement.

Before proceeding to the next claims, the court will clarify one aspect of its order. Under the 1996 Agreement, confidential information is defined to include "the particular demands and requirements of customers and insureds generally." Doc. no. 82-1 at 3 of 5. This term is vague. It seems to relate to knowledge of the preferences of HCC's clients, as well as the general preferences of customers in the specialty insurance market. It does not appear to relate to sensitive

client data, as that information is covered by the phrase

"client insurance, financial and commercial data." Id.

The problem with the phrase relating to customer preferences is that, interpreted broadly, it could effectively operate as a perpetual and expansive noncompete agreement. By necessity, Woodbury will rely on his general knowledge about the preferences of customers in selling insurance products, whether he is targeting HCC clients or other potential customers. Given that the 1996 Agreement explicitly defines Woodbury's noncompete obligations, and limits those obligations to two years, the court cannot interpret the phrase in that broad manner. But HCC offers no narrower or other reasonable interpretation of the phrase.

Ultimately, HCC bears the burden of demonstrating that it is entitled to relief. See Monroig-Zayas, 445 F.3d at 18. In addition, the court is mindful that an injunction must be sufficiently clear to allow the person enjoined to know "precisely what conduct is outlawed." Ben David v. Travisono, 495 F.2d 562, 564 (1st Cir. 1974) (quoting Schmidt v. Lessard, 414 U.S. 473 (1974)); see also Fed. R. Civ. P. 65(d)(1). Thus, for purposes of the preliminary injunction, the court will strike the vague and undefined phrase "the particular demands and requirements of customers and insureds generally" from the

definition of "confidential information" under the 1996
Agreement.  The remainder of the definition will stand.

Accordingly, Woodbury is enjoined from using or disclosing
HCC's confidential information, as that term is defined under
the 1996 Agreement and as modified by this order.

II.  Remaining Claims against Woodbury

HCC also argues that it is entitled to preliminary
injunctive relief against Woodbury on the basis of Woodbury's
breach of the 2001 Release and his violation of the CPA.  On
these two claims, HCC alleges the same types of irreparable
injuries and offers the same equitable considerations as it does
with respect to its first breach of contract claim.

Because HCC raises no new arguments on the factors of
irreparable injury and the balancing of the equities, the
court's prior analysis applies with equal force to these
remaining two claims.[18]  As a consequence, even if relief were
warranted on the claims for breach of the 2001 Release and

_____

[18] As this court noted in its order on HCC's motion to
amend, HCC did not discover the 2001 Release until July 2017.
It could be argued that HCC's late discovery of the 2001 Release
alters whether HCC's delay in bringing the present motion is
excusable.  The court finds that it does not.  As discussed,
because of its delay in bringing the present motion, HCC's
argument for irreparable harm is not plausible.  See Taylor, 971
F. Supp. 2d at 853.  HCC's argument becomes no more plausible
simply because HCC is raising it in the context of a new cause
of action.

violation of the CPA, it would be duplicative of the relief granted with respect to the claim for breach of the 1996 Agreement.  <u>See</u> Section I(b)-(c), <u>supra</u>.  Accordingly, the court declines to engage in any further analysis of the two remaining claims.

III.  <u>Tortious Interference with Contractual Relations by PPI</u>

In its amended complaint, HCC alleges that PPI tortiously interfered with HCC's contracts with Woodbury: the 1996 Agreement and the 2001 Release.  HCC argues that it has shown a likelihood of success on this claim.  Further, relying on the same considerations as it does with respect to the first breach of contract claim against Woodbury, HCC contends that the other three factors favor preliminary injunctive relief.

Defendants respond that HCC has not demonstrated a likelihood of success on the merits because there is no evidence that PPI acted improperly, wrongfully, or in bad faith.[19]  And defendants likewise rely on the same considerations to argue that the factors of irreparable harm, the equities, and the public interest disfavor a preliminary injunction.

---

[19] Defendants make certain other arguments that only merit brief comment.  The court need not address defendants' arguments premised on the unenforceability of the 1996 Agreement, because the court has concluded that the 1996 Agreement is enforceable in part.  Similarly, the court rejects as undeveloped PPI's conclusory argument that the 1996 Agreement unlawfully restricts PPI's business opportunities in violation of public policy.

The court concludes that a preliminary injunction is warranted against PPI to the same extent as against Woodbury. Consequently, the court confines its analysis of HCC's likelihood of success on this claim to those provisions the court has already determined to be enforceable: the nonsolicitation and nondisclosure provisions of the 1996 Agreement.

### a. Likelihood of Success

Neither side disputes that the court should apply New Hampshire law to HCC's claim for tortious interference with contractual relations. To prove that claim under New Hampshire law, "a plaintiff must show that: (1) the plaintiff had an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) the plaintiff was damaged by such interference." City of Keene v. Cleaveland, 118 A.3d 253, 259 (N.H. 2015) (internal quotation marks omitted). "Whether the alleged conduct is improper requires an inquiry into the mental and moral character of the defendant's conduct." Id. (internal quotation marks omitted). Relying on Section 767 of the Restatement (Second) of Torts, the New Hampshire Supreme Court has articulated a number of factors relevant to this inquiry:

```
    (a)  the nature of the actor's conduct,
    (b)  the actor's motive[,]
    (c)  the interests of the other with which the actor's
         conduct interferes,
    (d)  the interests sought to be advanced by the actor,
    (e)  the social interests in protecting the freedom of
         action of the actor and the contractual interests
         of the other,
    (f)  the proximity or remoteness of the actor's conduct
         to the interference and
    (g)  the relations between the parties.
```

Roberts v. Gen. Motors Corp., 643 A.2d 956, 961 (N.H. 1994)

(quoting Restatement (Second) of Torts § 767 (1977)).

The New Hampshire Supreme Court has not definitively addressed how these factors should be weighed in the present context, where a former employer sues a new employer on the basis that the new employer induced an employee to breach his restrictive covenant. Many courts require a showing that the new employer had an improper motive or employed improper means; the mere act of knowingly hiring an employee subject to a restrictive covenant is insufficient. See, e.g., Upromise, Inc. v. Angus, No. 13-cv-12363, 2014 WL 212598, at *9 (D. Mass. Jan. 21, 2014) (collecting cases under Massachusetts law); ZeeBaaS, LLC v. Koelewyn, No. 3:11cv11, 2012 WL 2327693, at *5 (D. Conn. June 19, 2012) (Connecticut law). Considerations include whether "whether the new employer capitalized on certain accounts or information held by the employee but protected by a restrictive covenant; whether the new employer encouraged the employee to contact the customers of the old employer; . . .

and, generally, whether the new employer acquiesced in or benefitted from the wrongs of the new employee." Fowler v. Printers II, Inc., 598 A.2d 794, 804-05 (Md. Ct. Spec. App. 1991).

The court concludes that HCC is likely to show that PPI tortiously interfered with the 1996 Agreement. HCC has shown that the nonsolicitation and nondisclosures provisions of the 1996 Agreement are valid and enforceable, and that PPI knew of the 1996 Agreement when it hired Woodbury. With respect to the element of intentional and improper interference, the court finds that the record supports HCC's claim. This is not a case where a new employer merely hires an employee subject to a restrictive covenant. Rather, PPI actively sought to exploit the good will and reputation that Woodbury had developed for HCC by having Woodbury divert the business of HCC's current policy holders to PPI.

Further, although there is little direct evidence on the matter, there is sufficient circumstantial evidence to indicate that PPI at least tacitly permitted Woodbury to use confidential information to compete against HCC. The record suggests that PPI had no qualms about eliciting HCC's confidential information from Woodbury: during employment negotiations, for example, PPI obtained information about HCC's finances and client base from

Woodbury.  Further, the evidence shows that PPI's purpose in hiring Woodbury was not merely to employ an experienced professional to lead a new division——it was to specifically exploit Woodbury's position at HCC to enrich PPI at the expense of HCC.  As described above, Woodbury has since misused HCC's confidential information to achieve that objective.  A reasonable inference from these facts is that PPI permitted Woodbury to use confidential information.  HCC has therefore shown that PPI's interference was intentional and improper, and that damages resulted.

Accordingly, as it pertains to the nonsolicitation and nondisclosure provisions of the 1996 Agreement, HCC has shown a likelihood of success on the merits of its claim for intentional interference with contractual relations.

### b. Irreparable Harm, Balancing of the Equities, and Public Interest

Because the parties offer no distinct considerations on the three remaining factors for preliminary injunctive relief, the court need not engage in a separate analysis.  HCC's delay, and the likelihood that its injuries will be compensable through monetary damages, militates against an injunction prohibiting PPI from competing against HCC.  In addition, there is less of a public interest in such an injunction against PPI, because, unlike Woodbury, PPI is not a party to any restrictive covenant.

Cf. Harnett, 943 F. Supp. 2d at 245-46 (recognizing "a public interest in allowing a company to receive business from a client even where an employee is bound by a non-solicitation covenant").  Nevertheless, for the reasons discussed above, the three factors weigh in favor of a narrow injunction prohibiting PPI from using or disclosing HCC's confidential information.

Accordingly, the court orders a preliminary injunction against PPI prohibiting it from using or disclosing HCC's confidential information, as that term is defined under the 1996 Agreement and modified in this order.  See Section I(e).

Having reached this conclusion, the court need not address the claim against PPI under the CPA.  This is because, to the extent any relief is warranted on the CPA claim, it would be duplicative of the relief granted as to the claim for tortious interference with contractual relations.

IV.  Security Bond

Finally, defendants request that the court order HCC to post an injunction bond, as contemplated by Federal Rule of Civil Procedure 65(c).  That rule provides, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

Fed. R. Civ. P. 65(c). A district court has "substantial discretion to dictate the terms of an injunction bond." Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991).

In this case, the court finds that, given the subject matter and circumscribed nature of the injunction, defendants do not stand to incur any costs or damages from the issuance of the preliminary injunction. Therefore, the court declines to require HCC to post security. See Ligotti v. Garofalo, 562 F. Supp. 2d 204, 227-28 (D.N.H. 2008).

**CONCLUSION**

For the reasons stated herein, HCC's motion for a preliminary injunction (doc. no. 23) is GRANTED to the extent it seeks an injunction prohibiting defendants from using or disclosing all data, documents, information, and other materials constituting HCC's "confidential information," and is otherwise DENIED.[20] Thus, pending further order of the court, defendants are enjoined from using or disclosing the following:

> HCC's business strategies; customer lists; client insurance, financial and commercial data including

---

[20] The parties filed requests for findings of fact and rulings of law. See doc. nos. 61, 67. Those requests are granted to the extent consistent with this order, and otherwise denied.

underwriting information and guidelines, policy
language and premium data; and business and financial
records.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

January 30, 2018

cc:  All Counsel of Record